# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | MISC. NO. |
| v. : | |
| : | **Filed Under Seal** |
| CHARLOTTE BESUMBU ETONGWE, : | |
| : | |
| **Defendant.** : | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

**I.     IDENTITY OF THE AFFIANT**

I, Adam Pool being duly sworn, state:

1. I have been a Special Agent of the Federal Bureau of Investigation ("FBI") from 2005 to the present. I have received training in basic law enforcement investigation, complex investigations, interviewing, source handling, and surveillance. I was previously assigned to work National Security investigations for approximately thirteen years. I have applied for FISA warrants, participated in long term human source operations and undercover operations, and conducted and participated in multiple arrests of individuals involved in National Security investigations in both the New York and Washington, D.C., offices of the FBI. Since April 2018, I have been assigned to a white-collar crime squad at the FBI's Washington Field Office, specifically focused on the investigation of health care fraud and other health care crimes. Since that time I have conducted multiple investigations and arrests of individuals participating in various health care fraud schemes.

2. I am assigned to this investigation and my involvement has included interviewing witnesses and reviewing D.C. Medicaid billing claims data, timesheets, and other records.

## II.     REASON FOR AFFIDAVIT

3. This affidavit is made in support of a criminal complaint charging CHARLOTTE BESUMBU ETONGWE ("ETONGWE") with health care fraud crimes in violation of 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1035 (Health Care False Statements). This affidavit is also submitted in support of an arrest warrant.

4. Since approximately February 2, 2012 through the present ETONGWE has been employed as a Personal Care Aide ("PCA") providing home health care services to residents of the District of Columbia that receive Medicaid. ETONGWE uses a unique National Provider Information ("NPI") Number to submit timesheets to home health agencies ("HHA"), which in turn bill Medicaid and pay ETONGWE.

5. On April 18, 2018, a Report of Investigation for ETONGWE was issued to the FBI by the D.C. Department of Health Care Finance ("DHCF"). ETONGWE was identified by DHCF as a PCA who was submitting timesheets to multiple HHAs containing overlapping hours. In December 2018, the FBI, the D.C. Medicaid Fraud Control Unit ("MFCU"), and the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), opened a joint investigation into allegations that ETONGWE defrauded D.C. Medicaid by submitting and causing to be submitted false claims concerning the provision of PCA services.

6. The investigation confirmed those allegations, revealing that ETONGWE obtained an NPI number and caused false claims to be submitted under the name CHARLOTTE B. ETONGWE using the NPI number ending in 7974. The false claims can be categorized broadly as follows: (1) claims purporting that ETONGWE provided services in excess of 22 hours in a given day and (2) claims purporting that ETONGWE provided services to multiple Medicaid beneficiaries in overlapping hours for different HHAs.

7. The claims data further shows that during the period of July 1, 2014 through March 2, 2019, ETONGWE was employed by approximately eleven HHAs: HHA-1 through HHA-11 (collectively the "eleven HHAs"). The eleven HHAs were registered to do business in the District of Columbia to provide home health services to Medicaid beneficiaries. ETONGWE also purported to provide PCA services for up to 22 different Medicaid beneficiaries in that time period.

8. The facts and information contained in this affidavit are based on my personal knowledge of the investigation and the observations and reports of other law enforcement officers. This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts which are necessary to establish that probable cause exists.

### III. OVERVIEW OF DISTRICT OF COLUMBIA MEDICAID PROGRAM AND HOME HEALTH CARE SERVICES

9. Medicaid is a health insurance program established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers of Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services. The federal government provides the funding for 70-80% of Medicaid and the District provides the remaining funds. Through September 30, 2008, Medicaid was administered by D.C.'s Department of Health's Medical Assistance Administration; however, since October 1, 2008, Medicaid has been administered by D.C.'s Department of Health Care Finance. Medicaid provides health insurance coverage to residents of the District of Columbia whose incomes are below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by Medicaid are referred to as "beneficiaries." In the

District of Columbia, a beneficiary is assigned a DCID, a unique 8-digit number that is used to bill Medicaid for services provided to the beneficiary.

10. In the District of Columbia, home health agencies can provide certain services including skilled nursing, home health aide, and personal care services. Personal care services are intended to assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

11. To be eligible to participate in Medicaid, HHAs must agree to abide by all federal and local laws, regulations, and program manuals governing Medicaid reimbursements. To receive reimbursement from Medicaid, HHAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form, to DHCF. As part of the claim, an HHA must provide certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was provided, and the amount of money being claimed by the HHA as payment from Medicaid. Medicaid only pays for services that are medically reasonable and necessary, and that are actually provided as claimed.

12. HHAs employ and contract with personal care aides to provide services to Medicaid beneficiaries. Under the Medicaid rules, a PCA must meet certain qualifications. Those qualifications include: (a) being at least 18 years of age; (b) being a citizen of the United States or an alien who is lawfully authorized to work in the United States; (c) completing a home health aide training program that involves at least 75 hours of classroom training with at least 16 hours devoted to supervised practical training; (d) passing a competency evaluation for the services which the PCA is required to perform consistent with the requirements set forth in 42 C.F.R. § 484.36; (e) obtaining certification in cardiopulmonary resuscitation and maintaining such

certification annually; (f) demonstrating that the PCA is free from communicable disease as confirmed by an annual PPD Skin Test or documentation from a primary care physician stating that the person is free from communicable disease; and (g) passing a criminal background check. PCAs are issued a unique 10-digit NPI number, which the HHA uses to bill Medicaid for services rendered to a beneficiary based on timesheets submitted by the PCA.

13.     To receive personal care services under Medicaid, a beneficiary must obtain a prescription from a doctor, informally known as an "intake." Medicaid only pays for personal care services if the doctor determines after a face-to-face physical examination that the beneficiary has functional limitations in one or more ADLs. DHCF regulations that went into effect in November 2013 clarified that the doctor prescribing the intake must be the beneficiary's primary care physician with whom the beneficiary had a pre-existing doctor-patient relationship.

14.     A beneficiary takes the intake to an HHA, which in turn arranges for a registered nurse to perform an initial assessment of the beneficiary's functional status and needs. The nurse drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required to specify the frequency, duration, and expected outcome of the personal care services and is supposed to be tailored to address the individual needs of the beneficiary.

15.     The HHA then assigns a PCA to provide the personal care services set forth in the POC to the beneficiary. Services are typically provided in the beneficiary's home and PCAs must document the provided care on a timesheet that is submitted to the HHA. The timesheet is supposed to accurately reflect the date the PCA provided services, the itemized services rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary. However, a single timesheet can contain a full week of services. HHAs use the timesheets to determine and

justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

## IV. FACTS SURROUNDING PROBABLE CAUSE

16. As mentioned above, this investigation has revealed that ETONGWE submitted or caused to be submitted false timesheets to several HHAs for payment for PCA services not rendered to beneficiaries. The HHAs subsequently sought and received payments from D.C. Medicaid based on ETONGWE's fraudulent timesheets.

17. During the course of the investigation, law enforcement has obtained, among other things, some of ETONGWE's employment records and D.C. Medicaid billing claims data associated with ETONGWE's NPI number ending in 7974. Law enforcement also has interviewed witnesses.

### A. Billing for Days Exceeding 22 Hours of Service

18. A review of D.C. Medicaid claims data from July 1, 2014 through July 14, 2015, shows 177 days, including holidays, in which ETONGWE purportedly provided 22 or more hours of PCA services for several Medicaid beneficiaries. During this timeframe, D.C. Medicaid paid HHAs, on ETONGWE's behalf, approximately $76,811.

19. This includes 26 consecutive days from July 1, 2014, through July 26, 2014, in which ETONGWE purportedly provided eight hours of PCA services to three separate beneficiaries associated with three separate HHAs (B-3/HHA-3, B-7/HHA-4, B-5/HHA-5). Stated differently, the claims data indicates that for that 26-day period in July 2014, ETONGWE purportedly worked 96 units (or 24 hours) each day, resulting in Medicaid paying three HHAs, on ETONGWE's behalf, approximately $10,857.[1]

---

[1] The investigation has included a review of the D.C. Medicaid claims data to determine what claims were submitted to Medicaid on behalf of ETONGWE and what claims were paid. The government also has reviewed many, but not all, of the timesheets submitted by ETONGWE. Some timesheets, such as ones from the July 1, 2014 through July 26, 2014 time period are currently not in the government's possession.

20. As an additional example, ETONGWE caused D.C. Medicaid to be billed for 96 units (or 24 hours) of PCA services that she purportedly provided on June 16, 2015 for three beneficiaries associated with three HHAs. As a result, Medicaid paid the three HHAs a total of approximately $453 for that day. A review of the timesheets submitted by ETONGWE for the three beneficiaries showed overlapping hours of services. Table 1 provides additional details gathered from the review of ETONGWE's timesheets and the D.C. Medicaid claims data for June 16, 2015.

| TABLE 1 | | | | | | |
|---|---|---|---|---|---|---|
| **Date of Service** | Timesheet Beginning Time | Timesheet End Time | Home Health Agency | Beneficiary | Hours of Work Claimed | Amount Paid |
| **June 16, 2015** | 8:00 AM | 4:00 PM | HHA-1 | B-1 | 8 | $151.04 |
| **June 16, 2015** | 9:00 AM | 5:00 PM | HHA-2 | B-2 | 8 | $151.04 |
| **June 16, 2015** | 7:00 AM | 3:00 PM | HHA-3 | B-3 | 8 | $151.04 |
| | | | | | | |
| **Total** | | | | | 24 | $453.88 |

21. As an additional example, ETONGWE caused D.C. Medicaid to be billed for 96 units (or 24 hours) of PCA services that she purportedly provided each day on December 29, 2014, December 30, 2014, December 31, 2014, January 1, 2015, and January 2, 2015. Across these five consecutive days, she purportedly provided three beneficiaries each with eight hours of PCA services. The three beneficiaries were associated with three HHAs. As a result, Medicaid paid the three HHAs a total of $2,240.96. The government does not currently have the ETONGWE timesheets associated with HHA-4 for this time period, but HHA-4 previously provided the government with information about the hours that ETONGWE claimed to work on these days. Moreover, her timesheets for the other two HHAs and two beneficiaries show overlapping hours of service. Table 2 provides additional details gathered from a review of D.C. Medicaid claims data, ETONGWE's HHA-3 and HHA-5 timesheets, and the information previously supplied by HHA-4.

7

| TABLE 2 ||||||
|---|---|---|---|---|---|
| Beneficiary | Home Health Agency | Dec. 29, 2014 Timesheet Beginning & Ending Time | Dec. 30, 2014 Timesheet Beginning & Ending Time | Dec. 31, 2014 Timesheet Beginning & Ending Time | Jan. 1, 2015 Timesheet Beginning & Ending Time | Jan. 2, 2015 Timesheet Beginning & Ending Time |
| B-3 | HHA-3 | 7:00AM-3:00PM | 7:00AM-3:00PM | 7:00AM-3:00PM | 7:00AM-3:00PM | 7:00AM-3:00PM |
| B-4 | HHA-4[2] | 8:00AM-4:00PM | 8:00AM-4:00PM | 8:00AM-4:00PM | 8:00AM-4:00PM | 8:00AM-4:00PM |
| B-5 | HHA-5[3] | 8:00AM-4:00PM | 8:00AM-4:00PM | 8:00AM-4:00PM | 8:00AM-4:00PM | 8:00AM-4:00PM |
| Total Hours Billed Each Day | | 24 | 24 | 24 | 24 | 24 |

22. ETONGWE also caused D.C. Medicaid to be billed for 88 units (or 22 hours) of PCA services that she purportedly provided on July 14, 2015 for three beneficiaries associated with three HHAs. As a result, Medicaid paid the HHAs a total of approximately $415 for that day. A review of the timesheets submitted by ETONGWE for the three beneficiaries showed overlapping hours of services. Table 3 provides additional details gathered from a review of ETONGWE's timesheets and the D.C. Medicaid claims data for July 14, 2015.

| TABLE 3 ||||||
|---|---|---|---|---|---|
| Date of Service | Timesheet Beginning Time | Timesheet End Time | Home Health Agency | Beneficiary | Hours of Work Claimed | Amount Paid |
| July 14, 2015 | 8:00 AM | 4:00 PM | HHA-1 | B-1 | 8 | $151.04 |
| July 14, 2015 | 7:00 AM | 3:00 PM | HHA-3 | B-3 | 8 | $151.04 |
| July 14, 2015 | 8:00 AM | 2:00 PM | HHA-6 | B-6 | 6 | $113.28 |
| Total | | | | | 22 | $415.36 |

---

[2] Although the government does not currently possess ETONGWE's timesheets associated with HHA-4 for this time period, HHA-4 previously provided the government with an Excel file that contained HHA-4's records of ETONGWE's check-in and check-out times for December 29, 2014 to January 2, 2015; HHA-4's records show that she checked in at 8:00 a.m. and checked out at 4:00 p.m. on those dates.

[3] For HHA-5's timesheet, the PCA is supposed to circle "AM" or "PM" in the row indicating what time they arrived and the row indicating what time they left. Neither "AM" nor "PM" is circled on the timesheet that relates to ETONGWE's alleged PCA services for B-5 covering the time period from December 29, 2014 through January 2, 2014. However, timesheets for that same beneficiary covering the time periods January 5, 2015 through January 11, 2015; January 12, 2015 through January 18, 2015; and February 2, 2015 through February 7, 2015, all list ETONGWE's arrival time as 8:00 a.m. and her departure time as 4:00 p.m.

8

### B. Wage History

23. Although the government does not yet have full wage history reports from each HHA, an examination of wage history records from five HHAs revealed that ETONGWE was employed and received wages from at least five of the home health agencies from 2014 through 2017. According to the wage history records provided by five of the HHAs, ETONGWE's approximate earnings for 2014, 2015, 2016, and 2017, were as follows:

| TABLE 4 | | |
|---|---|---|
| **Reported Earnings Year** | Home Health Agencies | Reported Earnings |
| **2014** | HHA-4 | $16,102 |
| **2015** | HHA-3, HHA-4, HHA-6 | $21,901 |
| **2016** | HHA-5, HHA-7 | $39,826 |
| **2017** | HHA-5, HHA-7 | $14,595 |

### C. Personnel File

24. A review of ETONGWE's personnel file with HHA-3 included an October 15, 2015, letter from HHA-3 to ETONGWE, which stated in part: "On September 8, when you met the following [HHA-3] [s]taff . . . , *you admitted to recording a different time on your timesheet from that which you were assigned to work, and actually worked*. You were assigned to work with a client for another agency during the same time that you were assigned to work for one of [HHA-3]'s clients. By your own admission, you recorded a different time on your timesheet than the time you actually worked for the client of the other agency so you could be paid by both agencies while working with both clients concurrently" (emphasis added).

## V. CONCLUSION

25. Based upon the facts and circumstances contained in this affidavit, your affiant believes there is probable cause to issue an arrest warrant for ETONGWE for violating 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1035 (Health Care False Statements).

Respectfully submitted,

_____
Special Agent Adam Pool
Federal Bureau of Investigation

Sworn to and subscribed before me this _____ day of June, 2019.

_____
Magistrate Judge